IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNION ELECTRIC COMPANY d/b/a AMERENUE, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. |
| ENERGY INSURANCE MUTUAL LIMITED, | ) ) ) **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) |

## VERIFIED COMPLAINT

Plaintiff Union Electric Co. d/b/a AmerenUE ("UEC"), a Missouri public utility with its headquarters and principal place of business in St. Louis, Missouri, hereby alleges as its Complaint against Energy Insurance Mutual Limited ("EIM"), as follows:

## NATURE OF THIS ACTION

1. In the early morning hours of December 14, 2005, the upper reservoir wall of UEC's Taum Sauk pumped storage hydroelectric power plant ("Taum Sauk") in Reynolds County, Missouri, failed. The failure caused over one billion gallons of water to be released from the reservoir, cutting a scour of vegetation and soil to bedrock down the side of Proffit Mountain, through the Johnson's Shut-Ins State Park (the "Park"), and down the East Fork of the Black River. This sudden and catastrophic release of water caused bodily injury as well as significant damage to State property and resources and damage to certain private landowners in the area.

2. UEC purchased from EIM, a Barbados insurer headquartered in Florida, a $100 million excess liability insurance policy (the "EIM Policy") for the period that

included the date of the Taum Sauk breach. UEC has sought reimbursement from EIM under the EIM Policy for costs incurred in connection with defending and resolving claims and litigation resulting from the breach, including a $177 million settlement with the State of Missouri for property damage to the Park and other natural resources of the State.

3. Although EIM was notified immediately of the Taum Sauk breach, was kept fully advised of the efforts to resolve all claims against UEC relating to the breach, and offered its opinions and recommendations regarding positions UEC should take in defending and settling those claims, EIM has now failed and refused to fully reimburse UEC up to the limits of the EIM Policy for UEC's covered costs incurred with respect to these claims, including the amount of the settlement with the State of Missouri. EIM's wrongful refusal to honor its contractual obligations not only has denied UEC the reimbursement from EIM to which it is lawfully entitled, but it has impaired UEC's ability to recover covered costs from the insurers that provided coverage in excess of the EIM Policy.

4. UEC therefore brings this action for breach of contract and vexatious refusal to pay, seeking damages and prejudgment interest arising from EIM's breach of its obligations under the EIM Policy, together with statutory penalties and attorneys' fees pursuant to §§ 375.296 and 375.420 RSMo for EIM's vexatious refusal to pay all insurance benefits to which UEC is entitled under the EIM Policy.

5. UEC also seeks declaratory and other relief pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201 et seq. and Rule 57 of the Federal Rules of Civil Procedure declaring that this dispute is properly a matter within the jurisdiction

of this Court rather than subject to arbitration, and enjoining EIM from commencing arbitration against UEC. UEC is entitled to such relief because the Missouri General Assembly has declared that it is the law of Missouri that arbitration provisions in insurance contracts are unenforceable. *See* § 435.350 RSMo.

## PARTIES

6. Plaintiff UEC is a Missouri public utility, incorporated in Missouri, with its headquarters and principal place of business in St. Louis, Missouri.

7. Defendant EIM is an insurance company domiciled in Barbados with its principal place of business in Tampa, Florida. At all relevant times, EIM was authorized to, and did in fact, conduct insurance business in Missouri, including issuing insurance policies to UEC in Missouri covering UEC's operations in Missouri.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) because complete diversity exists between the parties and the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional limit of $75,000.

9. This Court has personal jurisdiction over defendant EIM pursuant to the Missouri long-arm statute, § 506.500 RSMo, in that EIM contracted to insure a risk within this State, and pursuant to §§ 375.256 and 375.906, in that EIM is deemed to have appointed the Missouri Department of Insurance as its agent for service of process in this State.

10. Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because a substantial part of the events and omissions giving rise to UEC's claim occurred in this District and EIM is subject to personal jurisdiction here. Venue is proper in the Eastern Division pursuant to Local Rule 3-2.07 because EIM is not a resident of the Eastern

District of Missouri and UEC has its principal place of business in the City of St. Louis, which is within the Eastern Division of the Eastern District of Missouri.

## STATEMENT OF FACTS

11. UEC owns Taum Sauk, a reversible pumped storage hydroelectric project used to supplement the generation and transmission facilities of UEC. Taum Sauk consisted of a 1.4-billion gallon upper reservoir located atop Proffit Mountain, a shaft and tunnel conduit, a powerhouse/pumping station located at the base of Proffit Mountain, and a lower reservoir located along the East Fork of the Black River. When operational, Taum Sauk generates electrical power when water stored in the upper reservoir is released through a channel excavated into Proffit Mountain and flows through turbines located in a powerhouse at the base of Proffit Mountain. The water then is pumped from the lower reservoir back into the upper reservoir, where it is stored until needed for further generation.

### The Taum Sauk Breach

12. On the morning of December 14, 2005, the northwest corner of the upper reservoir failed (the "Taum Sauk breach"), releasing more than one billion gallons of water down the northwest side of Proffit Mountain. The breach flow passed into the East Fork of the Black River, through the Park, and then into the lower reservoir.

13. The breach flow scoured a mile-long swath of the heavily–forested slope of Proffit Mountain to bedrock, sending tons of trees, soil, boulders and vegetation downhill into the Park. The breach flow destroyed the home of the Park Superintendent, flooded motorists on Highway N, and extensively damaged the Park and campground. Trees stripped from the side of Proffit Mountain were piled 15 feet high in some parts of the Park and sand and clay up to eight feet deep covered much of the area. The breach

waters deposited tons of sediment into the lower reservoir, scoured a hole at the base of Proffit Mountain and created a six-acre lake where displaced boulders dammed the East Fork. Private landowners downstream along the East Fork claimed that sediment flowed from the lower reservoir into the East Fork, causing degradation of water quality and leaving sediment deposits on their property.

14. UEC, through its insurance broker, notified EIM of the Taum Sauk breach in writing on December 14, 2005.

### The EIM Policy

15. Ameren Corporation ("Ameren") regularly purchases liability insurance to protect itself and its subsidiaries, including UEC, against third-party claims arising from its business operations. For the period of September 1, 2005 to September 1, 2006, Ameren purchased a primary liability policy, numbered X2595A1A05, from Associated Electric & Gas Insurance Services Limited (the "AEGIS Limited Policy"). A copy of the AEGIS Limited Policy is attached hereto as Exhibit A. The AEGIS Limited Policy provides $35 million of coverage, per occurrence and in the aggregate, in excess of a $1 million self-insured retention ("SIR"). AEGIS Limited is not a party to this action because it exhausted the $35 million limit of its policy through reimbursement payments to UEC for liability resulting from the breach of the Taum Sauk reservoir.

16. Ameren also purchased the EIM Policy, a Following Form Excess General Liability Indemnity Policy numbered 501705-05GL. A copy of the EIM Policy is attached hereto as Exhibit B. The EIM Policy, which also was in effect for the period of September 1, 2005 through September 1, 2006, provides $100 million of coverage, per occurrence and in the aggregate, in excess of the $35 million limit provided by the

AEGIS Limited Policy and the underlying $1 million SIR. The EIM Policy "follows the form" of the AEGIS Limited Policy.

17. Following the form of the AEGIS Limited Policy, the EIM Policy obligates EIM to:

> indemnify the INSURED for any and all sums which the INSURED shall become legally obligated to pay as ULTIMATE NET LOSS by reason of liability imposed upon the INSURED by law or liability assumed by the INSURED under CONTRACT... for damages because of... PROPERTY DAMAGE which is caused by an OCCURRENCE....

(Ex. B at ¶ I, p.1 of 9; Ex. A at ¶ I(A), p.1 of 16).

18. The definition of the term "ULTIMATE NET LOSS" incorporated into the EIM Policy includes "INDEMNITY" and "DEFENSE COSTS." (Ex. A at ¶ II(BB), p. 7 of 16).

19. The definition of the term "INDEMNITY" incorporated into the EIM Policy includes "all sums which the INSURED shall become legally obligated to pay as damages, including punitive damages where permitted by law, either by adjudication or compromise with the consent of the COMPANY ...." (Ex. A at ¶ II(K), p. 4 of 16).

20. The definition of the term "DEFENSE COSTS" incorporated into the EIM Policy includes "all expenses incurred by the INSURED in the investigation, negotiation, settlement and defense of any CLAIM . . . ." (Ex. A at ¶ II(G), p. 4 of 16).

21. The definition of the term "PROPERTY DAMAGE" incorporated into the EIM Policy includes "physical damage to or destruction of tangible property which occurs during the COVERAGE PERIOD, including the loss of use thereof at any time resulting therefrom . . . ." (Ex. A at ¶ II(Z), p. 7 of 16).

22. The definition of the term "OCCURRENCE" incorporated into the EIM Policy means, with respect to PROPERTY DAMAGE, "an accident, event or continuous or repeated exposure to conditions neither expected nor intended from the standpoint of the INSURED . . . ." (Ex. A at ¶ II(S), p. 6 of 16).

23. Although the EIM Policy contains a "dispute resolution" provision that facially calls for the arbitration of certain coverage disputes (Ex. B at ¶ IV(J), pp. 6-9 of 9), this provision is void and unenforceable pursuant to § 435.350 of the Missouri Uniform Arbitration Act. *See* § 435.350 RSMo ("A written agreement to submit any existing controversy to arbitration or a provision in a written contract, *except contracts of insurance* and contracts of adhesion, to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract . . .) (emphasis supplied). The EIM Policy further purports to designate New York law as governing the interpretation of the Policy. (Ex. B at ¶ IV(I), p. 6 of 9).

### The Taum Sauk Claims

24. On December 13, 2006, following months of negotiations between UEC and various State entities, the Attorney General of the State of Missouri filed a civil suit against UEC (the "Taum Sauk Claim") captioned *State of Missouri v. Union Electric Co.*, No. 0622-CC07160 (No. 07RE-CC00005 following change of venue to the Circuit Court of Reynolds County, Missouri), seeking actual and punitive damages for the extensive environmental damage caused by the Taum Sauk breach. A copy of the Petition in the Taum Sauk Claim is attached hereto as Exhibit C.

25. The State alleged in its Petition, *inter alia*, that the Taum Sauk breach caused "tremendous damage to public and private property, including but not limited to Johnson's Shut-Ins State Park, the park superintendent's residence, and the State's natural resources." (*See* Ex. C at ¶ 29). The State further alleged that UEC's "acts or omissions caused or contributed to the failure of the upper reservoir, and all the resulting injuries to the State would not have occurred but for Ameren's conduct." (*See* Ex. C at ¶ 51).

26. In early 2007, the Missouri Department of Natural Resources ("MDNR") filed a motion to intervene in the State's lawsuit on the ground that the Attorney General could not adequately represent its interests. After briefing and argument, the motion was denied. The Attorney General and MDNR, together with the Missouri Conservation Commission ("MCC"), then agreed to engage in joint settlement discussions with UEC to resolve the State's action in consideration for, *inter alia*, remediation and restoration of the Park in accordance with a Master Plan developed by MDNR, the payment of damages, and the provision of a railroad right-of-way for extension of the Katy Trail.

27. Throughout the settlement negotiations, EIM was kept fully informed of the status of the negotiations and was given every opportunity to ask questions, to give feedback and provide advice and recommendations. At no time during the negotiations did EIM advise UEC that any offer by UEC was unreasonable or excessive.

### The Consent Judgment

28. On November 27, 2007, after nearly two years of intensive settlement negotiations with the Attorney General, the MDNR, and the MCC (collectively, the "State"), UEC entered into an agreement with the State to settle the Taum Sauk Claim for

monetary and in-kind payments by UEC totaling approximately $177 million, including up to $103 million for remediation and restoration of the Park. The cost to UEC to settle this one claim was well in excess of EIM's Policy limits.

29. The settlement between UEC and the State was embodied in a Consent Judgment (the "Consent Judgment") filed with the Reynolds County Circuit Court on November 28, 2007. In a November 2007 press release announcing the terms of the Consent Judgment, then-Governor of Missouri Matt Blunt stated that, "[t]he Ameren Taum Sauk disaster was the worst man-made disaster in the history of Missouri . . . . The settlement we reached compensates the people of Reynolds County and the state of Missouri for the loss of natural resources and recreation associated with the Ameren Taum Sauk disaster."

30. On January 9, 2008, following a thirty-day public comment period, the Circuit Court of Reynolds County, Missouri, held a fairness hearing at which it approved and entered the Consent Judgment.

### Private Claims

31. In addition to the Taum Sauk Claim, other third-party property and business owners brought suit or made claims against UEC for damages resulting from property damage caused by the Taum Sauk breach, including, without limitation, *Barney's Bait, et al. v. UEC, et al.*, Reynolds County, Missouri Circuit Court No. 06RE-CC00025; *Roessler, et al. v. UEC, et al.*, Reynolds County, Missouri Circuit Court No. 08RE-CC00009; *Franklin, et al. v. UEC*, Crawford County, Missouri Circuit Court No. 09RE-CC00013; and *Anderson Land Development Co., et al., v. UEC, et al.*, Reynolds

County, Missouri Circuit Court No. 07RE-CC00023. Some of these claims have been settled and some remain pending.

### EIM's Refusal To Provide Coverage

32. By June 2007, UEC had exhausted the $35 million limit of the AEGIS Limited Policy, thereby triggering coverage under the EIM Policy. Since that time, UEC has made repeated requests to EIM for reimbursement, up to the limit of the EIM Policy, for all amounts incurred by UEC in connection with its liabilities arising from the Taum Sauk breach.

33. On February 15, 2008 and February 20, 2008, pursuant to its obligations under the Consent Judgment, UEC made cash payments to the State totaling $56,156,000. By letter dated February 21, 2008, UEC demanded indemnification from EIM for the full $56,156,000 cash payment. EIM refused to indemnify UEC for any portion of the cash payment in excess of $25 million based on its view that a damages award in the amount provided by the Consent Judgment was "excessive and inflated."

34. To date, UEC has paid or committed to pay all but approximately $700,000 of its $103 million maximum obligation under the Consent Judgment for remediation and rebuilding of the Park. EIM has refused to reimburse UEC for any portion of the remediation and rebuilding of the Park in excess of $56.4 million on the basis that this amount is all the compensation to which the State was reasonably entitled for damage to the Park.

35. EIM has further refused to reimburse UEC for its full contractual share of the amounts paid by UEC to settle claims of the private parties on the basis that the private parties were not entitled to such damages.

36. As of June 15, 2010, EIM had reimbursed UEC for only $68.7 million of the $100 limit of the EIM Policy, notwithstanding the fact that UEC has incurred at least $197.5 million in covered Ultimate Net Loss in connection with the Taum Sauk breach. EIM has provided no valid justification for its refusal to compensate UEC for its Ultimate Net Loss in excess of $68.7 million.

## COUNT I – BREACH OF CONTRACT

37. UEC hereby re-alleges paragraphs 1 through 36 above as though fully set forth herein.

38. The EIM Policy constitutes a binding contract between UEC and EIM for which UEC paid valuable consideration.

39. The Consent Judgment and the settlement of other claims against UEC arising out of the Taum Sauk breach, as alleged herein, constitute sums that UEC became legally obligated to pay as Ultimate Net Loss by reason of legal liability for damages because of "property damage" caused by an "occurrence." No exclusion, term, or condition of the EIM Policy eliminates coverage for these sums.

40. By refusing to compensate UEC for all Ultimate Net Loss incurred in connection with the Taum Sauk Claim in excess of the policy limit of the underlying AEGIS Primary Policy and SIR, EIM has breached its contractual obligations under the EIM Policy.

41. UEC has complied with all terms and conditions of the EIM Policy related to coverage that were not waived or otherwise excused by EIM.

42. As a direct result of EIM's breach of contract, delay and other conduct set forth herein, UEC has suffered damages in an amount in excess of the jurisdictional limit, to be proven at trial.

11

WHEREFORE, UEC respectfully requests a judgment:

A. Awarding damages to UEC in the amount of its unpaid covered losses arising out of the Taum Sauk breach to be proven at trial;

B. Awarding all costs and prejudgment interest allowed by law; and

C. Granting such other relief as the Court deems proper and just.

**COUNT II – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

43. UEC hereby re-alleges paragraphs 1 through 42 above as though fully set forth herein.

44. Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, this Court is vested with the power to determine questions regarding the construction and interpretation of contracts and is further vested with the power to declare the rights, liabilities or other legal relations of the parties thereunder.

45. There is a present controversy between UEC and EIM because the EIM Policy includes a provision that ostensibly provides for alternative dispute resolution and arbitration of certain disputes relating to the EIM Policy. (Ex. B, ¶ IV(J), pp. 6-9 of 9). Upon information and belief, EIM contends that the arbitration provision in the EIM Policy is valid and enforceable. Following the Taum Sauk breach, Ameren Corporation, on behalf of UEC, entered into a standstill agreement with EIM to afford the parties an opportunity to resolve any coverage disputes between them before either party initiated formal proceedings. The standstill agreement expired in November 2009.

46. UEC contends that the arbitration provision in the EIM Policy is void and unenforceable because the Missouri General Assembly has proscribed the enforcement of arbitration provisions contained in insurance policies through the enactment of § 435.350 of the Missouri Uniform Arbitration Act. *See* § 435.350 RSMo.

12

47. Arbitration of an insurance dispute is against the public policy of Missouri, and that public policy is particularly compelling where the insurance policy was issued in Missouri through a Missouri broker, the insured and the claimants are Missouri residents, the loss occurred in Missouri, and the arbitration provision at issue calls for application of the law of a state that has absolutely no nexus with the loss or the parties to the insurance policy.

48. As a matter of law, this Court must determine whether there is an enforceable agreement to arbitrate the dispute and whether there are any external legal constraints that foreclose arbitration.

49. Absent a declaration regarding the validity of the arbitration provision in the EIM Policy, UEC would suffer irreparable harm by facing the choice of either: (a) acceding to EIM's anticipated demand that UEC submit to arbitration, thereby running the risk of being deemed to have waived any contention that the dispute between the parties is not to be arbitrated but rather is to be resolved by this Court in accordance with Missouri law; or (b) not acceding to EIM's anticipated demand and running the risk of being deemed to have defaulted or otherwise having prejudiced its position should it ultimately be determined that, contrary to UEC's position, the dispute between UEC and EIM is arbitrable.

50. With respect to the issue of arbitrability, UEC has no adequate remedy at law.

51. By reason of the foregoing allegations, a real, immediate, and justiciable controversy exists with respect to the legal effect of the arbitration provision in the EIM

13

Policy on the coverage dispute between UEC and EIM relating to claims arising out of the Taum Sauk breach.

WHEREFORE, UEC respectfully requests a judgment:

    A.    Declaring that the arbitration provision in the EIM Policy is void and unenforceable;

    B.    Preliminarily and permanently enjoining and restraining EIM from instituting arbitration proceedings or otherwise seeking to compel UEC to arbitrate any dispute relating to the EIM Policy;

    C.    Awarding all costs and interest allowed by law; and

    D.    Granting such other relief as the Court deems proper and just.

## COUNT III - VEXATIOUS REFUSAL TO PAY

52.    UEC hereby re-alleges paragraphs 1 through 51 above as though fully set forth herein.

53.    At all times referenced herein, EIM has been obligated to reimburse UEC for all defense costs and indemnity payments incurred in connection with claims arising out of the Taum Sauk breach, up to the $100 million limit of the EIM Policy.

54.    Despite repeated demands, EIM has failed and refused to reimburse UEC for all of its covered Ultimate Net Loss in breach of the EIM Policy. EIM has acted unreasonably and has displayed an attitude that is vexatious and recalcitrant based on all the facts alleged herein, including, without limitation:

    a)    Allowing UEC to enter into the Consent Judgment without objecting to the amount of damages set forth therein or offering an alternative basis for settlement, and then refusing to fully indemnify UEC for damage

payments to the State made pursuant to the Consent Judgment, arguing that the amount of damages was unreasonable;

  b) Refusing to indemnify UEC for payments made under the Consent Judgment in reliance on a self-serving, unrealistic and unreasonable damage analysis prepared at the insurer's request months after the execution of the Consent Judgment;

  c) Repeatedly refusing to correct patent factual errors and erroneous methodology utilized by its damages consultant to justify its refusal to honor its coverage obligations to UEC;

  d) Deliberately mischaracterizing damage payments made by UEC to the State pursuant to the Consent Judgment, and ignoring the realistic range of the State's potential recovery at trial, including the possibility of punitive damages, in an effort to justify its refusal to honor its coverage obligations to UEC;

  e) Refusing to indemnify UEC fully, up to the limits of the EIM Policy, for all damage payments to the State on the improper and unsupported basis that UEC was not liable to the State for the full amount of damages provided for in the Consent Judgment because the amount of such damages was unreasonable;

  f) Refusing to indemnify UEC fully, up to the limits of the EIM Policy, for all damage payments to the State on the improper and unsupported basis that UEC was not liable to the State for more than the "replacement cost" of certain State property destroyed by the Taum Sauk breach, notwithstanding the fact that a "replacement cost" analysis is a first-party property insurance concept

that is inapplicable to tort liability and insurance coverage under a liability insurance policy; and

  g) Directing UEC on how much to offer in settlement on private party claims and then, after settlement was achieved, refusing to indemnify UEC for the payments on the grounds they were not for damages UEC was legally obligated to pay.

55. As a proximate result of EIM's unreasonable, vexatious and inexcusable refusal to honor its obligations under the EIM Policy, UEC has been damaged, and has been forced to bring this suit to enforce its rights under the EIM Policy.

WHEREFORE, UEC respectfully requests a judgment:

A. Awarding UEC statutory damages and its costs and attorneys' fees in an amount and to the extent permitted by §§ 375.296 and 375.420 RSMo;

B. Awarding all costs and interest allowed by law; and

C. Granting such other relief as the Court deems proper and just.

Respectfully submitted,

HAAR & WOODS, LLP

*/s/ Robert T. Haar*

Robert T. Haar #3297
Susan E. Bindler #36548
Lisa A. Pake #4022
Alison L. Esbeck #5247560
1010 Market Street, Suite 1620
St. Louis, Missouri 63101
(314) 241-2224
(314) 241-2227-facsimile

Of counsel:

Jill B. Berkeley
David H. Anderson
Seth D. Lamden
Howrey LLP
321 N. Clark St., Suite 3400
Chicago, IL 60654
(312) 595-1239
(312) 595-2250-facsimile

Attorneys for Plaintiff Union Electric
Company, Inc.

STATE OF MISSOURI    )
                     ) SS.
CITY OF ST. LOUIS    )

Comes now Mark Blair, of lawful age, being duly sworn upon his oath, and states that he is the Manager – Insurance Risk Management of Ameren Corporation, that the facts stated in the foregoing Complaint are true and correct to the best of his knowledge and belief, and that he is authorized to make this statement on behalf of Union Electric Company, Inc.

_____Mark E. Blair_____

Subscribed, verified and sworn to this 18th day of June, 2010, before

_____Barbara Lungwitz_____
Notary Public

My Commission Expires: 9/2/11

Barbara Lungwitz - Notary Public
Notary Seal, State of
Missouri - St. Louis City
Commission #07516095
My Commission Expires 9/2/2011

18